# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

JOHN SULLIVAN,

                    Plaintiff,

-vs-                                      Case No.  6:05-cv-815-Orl-KRS

COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.

_____

## ORDER

This cause came on for consideration without oral argument on the Complaint filed by John Sullivan, seeking review of the final decision of the Commissioner of Social Security denying his claim for social security benefits.  Doc. No. 1.  The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA).  Doc. No. 4.  Pursuant to the consent of the parties, this matter has been referred to me for disposition under 28 U.S.C. § 636(c).  Doc. Nos. 6, 7.

## I.   PROCEDURAL  HISTORY.

Sullivan applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Program (OASDI) 42 U.S.C. § 401 *et seq.* (sometimes referred to herein as the Act), alleging that he became disabled on April 2, 2001.  Sullivan's

-1-

application was denied initially, and he did not seek reconsideration. Sullivan filed a request for a hearing before an ALJ.  An ALJ held a hearing on September 16, 2004. Sullivan, represented by a person who was not an attorney, testified at the hearing. No other testimony was taken.  R. 404-22.

On December 7, 2004, after considering the testimony and the medical evidence presented, the ALJ issued a decision on Sullivan's application.  R. 12-19.  The ALJ determined that Sullivan was insured under OASDI through the date of the decision. R. 18. The ALJ found that Sullivan had not engaged in substantial gainful activity since the alleged onset date of his disability. R. 18.

The ALJ concluded that the medical evidence showed that Sullivan had mild degenerative joint disease of the left knee and that he had had right shoulder arthroscopic surgery, which were severe impairments.  These impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[1]  R. 17.  The ALJ agreed with two state agency psychologists that Sullivan had a nonsevere mental impairment with mild restrictions on activities of daily living, mild difficulties in maintaining social functioning, and mild deficiencies in concentration, persistence, and pace.  R.  15.

---

[1]     The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories." *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

The ALJ found that Sullivan had the residual functional capacity (RFC) to perform the following: stand, walk, and sit for six hours in an eight-hour workday, and lift up to twenty pounds.  He had occasional limitations in kneeling, crawling, and reaching overhead with his right arm.  R. 16.  Considering Social Security Rulings 83-14 and 85-15, which discuss the availability of work when a claimant has restrictions on stooping, bending, kneeling, and crawling, the ALJ concluded that these limitations did not prevent Sullivan from performing a significant range of light work.[2]  R. 16, 18.

Because Sullivan's past relevant work required more than a light level of exertion, the ALJ concluded that Sullivan could not return to his past relevant work.  R. 17. Relying upon the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt P, App. 2, the ALJ concluded that there were jobs available in the national economy that Sullivan could perform.  R. 18.

In reaching this conclusion, the ALJ gave little weight to the opinion of Drs. ZeBranek and Estampador-Tan, two consulting physicians, because their opinions that Sullivan could only briefly stand and walk were inconsistent with the opinions of Dr. Henningsen, Sullivan's treating physician, who placed Sullivan back to full duty work with no restrictions regarding his shoulder.  Their opinions were also inconsistent with the opinion of the state agency reviewing physician.  With respect to Sullivan's knee, the ALJ

---

[2]    Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567.

noted that the underlying injury occurred over seventeen years before the decision, that
Sullivan had been able to work despite the injury, that x-rays of his knee showed only
mild degenerative joint disease, that Sullivan walked with only a mild limp, and that
Sullivan had a full range of motion (ROM) in both the upper and lower extremities.  R. 16.

The ALJ also found that Sullivan's "allegations and subjective symptoms [are]
beyond what could be expected considering the objective laboratory and clinical
findings."  R. 16.  In support of this finding, the ALJ observed that Sullivan "lived a fully
functional type lifestyle, which is consistent with the medical evidence.  [He] is able to
take care of his personal needs.  He is able to drive and do yard work. . . .  He has not
been treated for his shoulder or knee for a few years.  In fact, he testified he could lift up
to 50 pounds occasionally."  *Id.*  The ALJ defined "occasionally" as "little to none to one-
third of the time."  *Id.*

Based on these findings, the ALJ concluded that Sullivan was not disabled for
purposes of the Act.  R. 19.

Sullivan requested review of the ALJ's decision. R. 8.  On March 25, 2005, the
Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 5-7.
Sullivan timely sought review of this decision by this Court.  Doc. No. 1.

II.     **JURISDICTION.**

The ALJ's decision became the final decision of the Commissioner when the

Appeals Council denied Sullivan's request for review.  *See Falge v. Apfel*, 150 F.3d

1320, 1322 (11th Cir. 1998); 20 C.F.R. § 404.981.  Therefore, the Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).

III.    **STATEMENT OF FACTS.**

A.      *Evidence from Sullivan and His Family.*

Sullivan was born June 6, 1967.  R. 408.  He is 5'10" tall, and weighed 210

pounds at the time of the hearing. *Id.*  Sullivan completed school through the eleventh

grade. *Id.* Nevertheless, he had problems with reading and spelling.  R. 415; *see also* R.

170-71 (written statement of Sullivan's wife).

Sullivan previously worked as a construction foreman, an equipment operator, a

maintenance manager, a shuttle driver at the airport, a restaurant cook, a janitor, and an

electrician's assistant.  R. 409-13, *see also* R. 104-09, 133-40.

Sullivan had problems with his left knee following a motor vehicle accident in

1987, when he was seventeen years old.  R. 414, 416.  He underwent arthroscopic

surgery of the knee.  R. 414. He estimated he could walk about sixty feet before his knee

would begin hurting.  R. 415.  His knee popped and occasionally gave out on him.  *Id.*

His knee would lock and hurt after sitting for more than thirty minutes, making it difficult

for him to stand up.  R. 416-17.  He could stand but needed to hold on to something to

balance and

take the weight off his foot.  R. 417.  He had fallen at work due to problems with his knee. R. 420.

Sullivan had problems with his right shoulder following a work accident. R. 415. He had difficulty lifting overhead.  He had weight restrictions of lifting no more than fifty pounds from the ground to waist-level and no more than twenty-five pounds from his waist to his shoulder. *Id.*   He estimated that he could lift fifty pounds occasionally.  R. 417.

Sullivan also experienced chronic headaches.  R. 421. Sullivan took ibuprofen and hydrocodone for pain, but it was not effective.[3]  R. 418.   His wife reported that Sullivan had difficulty sleeping due to pain. R. 168.

Sullivan had trouble with cooking and meal preparation.  He tried to do laundry and help with cleaning the house, but he needed to take breaks and get help from his family. R. 419; *see also* R. 141-46 (written statement of Sullivan's sister); R. 332 (interview of Sullivan's mother-in-law). He also had trouble lifting his foot to step out of the shower, and he had problems washing his hair and shaving due to difficulty lifting his arm.  R. 419; *see also* R. 169-70 (written statement of Sullivan's wife).

Sullivan could drive and there were no restrictions on his driver's license.  R. 409. However, his knees hurt if he sat for too long.  R. 421; *see also* R. 171 (written statement of Sullivan's wife).

_____

[3]        Hydrocodone, a narcotic analgesic, and ibuprofen, a nonsteroidal anti-inflammatory drug, are used in combination for the treatment of pain.  *See* Medline Plus, *Hydrocodone and Ibuprofen (Systemic)*, http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/203600.html (last visited Sept. 20, 2006).

B.    *Medical Records.*[4]

Sullivan was in a motor vehicle accident when he was seventeen years old in which his left knee was injured.  He had arthroscopic debridement of the knee, but continued to have progressively more difficulty walking.  R. 228. R. 229.

In June 1999, Sullivan strained his left shoulder.  R. 210.  In July, A. Palazzolo, M.D., restricted Sullivan from strenuous pulling or pushing, lifting more than twenty pounds, and reaching above the shoulder.  R. 210-18.

In August 1999, Harald Henningsen, M.D., an orthopedic surgeon, examined Sullivan for complaints of left shoulder pain.  He opined that Sullivan might have scapular bursitis, and prescribed Voltaren[5] and asked for shoulder x-rays to be performed.  R. 316.

In June 2000, Sullivan injured his right shoulder.  R. 205-09, 313.  In July, Dr. Palazollo instructed Sullivan to use a sling, and restricted him from lifting, pushing or pulling more than ten to twenty pounds.  R. 207.  This resulted in a light duty work restriction. R. 206-07.

---

[4]    Because Sullivan's allegations of error arise from the pain and functional limitations arising solely from his knee and shoulder impairments, I will not review the medical records regarding his mental impairments or treatment for other physical problems.

[5]    Voltaren is the brand name for diclofenac, a nonsteroidal anti-inflammatory medication used in the treatment of pain usually associated with arthritis.  Medline Plus, *Diclofenac*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a689002.html (last visited Sept. 20, 2006).

Dr. Henningsen examined Sullivan based on the complaints of right shoulder pain. His assessment was acromioclavicular (AC) joint[6] sprain.  R. 314.  Dr. Henningsen restricted Sullivan to no repetitive work at shoulder level or above and no lifting over twenty-five pounds.  R. 313-14.  He prescribed Vioxx and later administered an injection for the pain.  R. 311, 314-15.  In May 2001, Dr. Henningsen indicated that Sullivan was working without restrictions.  R. 309.

In June 2001, Dr. Henningsen assessed Sullivan with persistent AC joint symptoms with post traumatic arthritis.  R. 307-08.  He scheduled Sullivan for surgery. R. 308.  He also administered another injection.  R. 308.

Dr. Henningsen's operative report indicates that the surgery involved arthroscopic debridement of a labral tear[7] and excision of the AC joint. R. 317. "Degenerative changes around the AC joint [were] prominent." *Id.*  Sullivan tolerated the surgery well.  R. 318; *see also* R. 304, 306.  Initially, Dr. Henningsen restricted Sullivan to no lifting and no repetitive work at shoulder level or above.  R. 303-04.

Between August 2001 and February 2002, Sullivan received physical therapy at Healthsouth.  R. 230-93.  Physical therapists observed that Sullivan occasionally exhibited poor compliance with recommended treatment.  R. 287.  He experienced pain after he lost his balance and caught himself with his right arm and after he moved small boxes around the home.  R. 279-81, 274. At one point in September 2001, Sullivan rated

---

[6]       The acromioclavicular, or AC, joint is the joint between the clavicle and the scapula. STEDMAN'S at 19.

[7]       A tear in the labrum, a "ring of fibrocartilage" attached to the scapula. STEDMAN'S at 927.

his pain at between eight and ten on a ten-point scale, but he later indicated it was between five and eight.  R. 269, 262.

On September 10, 2001, Dr. Henningsen permitted Sullivan to lift no more than fifteen pounds with no repetitive overhead work.  R. 302.   Later in the month, Dr. Henningsen increased the amount of weight Sullivan could lift to twenty pounds.  R. 301. By October, Dr. Henningsen increased the weight Sullivan could lift to thirty pounds, still with no repetitive overhead work.  R. 300.  He continued to treat Sullivan's shoulder pain with injections and pain medication.  *See, e.g.,* R. 296-97.

In December 2001, Dr. Henningsen released Sullivan to full duty work without restrictions.  R. 297.  On February 5, 2002, the physical therapist noted that Sullivan's ability to raise his arm overhead and behind his head and neck was mildly limited.  R. 230.   In March 2002, Dr. Henningsen observed that Sullivan "lacks about 45 degrees full overhead elevation due to pain."  R. 296. In April 2002, Dr. Henningsen observed that Sullivan experienced pain that radiated to his elbow and hand.  He observed mild right median nerve entrapment of the carpal ligament.  He also observed that his external rotation with the right shoulder was "about 10 degrees less than the opposite side," with mild atrophy to the anterior deltoid.  He continued Sullivan without any work restrictions. R. 295.

As of July 22, 2002, Dr. Henningsen opined that Sullivan had reached maximum medical improvement with a 2% permanent impairment rating based on persistent

motion limitations and weakness.  He noted that Sullivan was working without

restrictions, but he was uncomfortable doing so.  R. 294.

Meanwhile, Sullivan continued to have problems with his left knee.  In September

2001, Sullivan was seen by James D. ZeBranek, D.O., M.A., at the request of SSA.  R.

228-29.  Sullivan reported that he could walk one block independently with knee pain.  R.

228.  Upon examination, Dr. ZeBranek observed decreased ROM in the left knee and

right shoulder.  There was no knee swelling, heat, redness, tenderness, signs of

inflammation, or instability.  However, Sullivan's gait was antalgic to the left.  Grip

strength and fine manipulation were normal.  An x-ray revealed non-weight bearing sub-

patellar chondral degeneration.[8]  R. 229.

Dr. ZeBranek's impression was left knee mild degenerative joint disease and

prepatellar chondral degeneration, and left patellofemoral syndrome[9] with uncontrolled

pain.  He concluded that Sullivan could return to work with activity restricted to sitting and

only brief standing.  R. 229.

In December 2002, Sullivan was seen by Josephine Estampador-Tan, M.D., at the

request of the Florida Department of Health for complaints of right shoulder pain and left

knee pain.  R. 326-28.  Sullivan ranked his right shoulder pain at three on a ten-point

scale, with the pain sometimes as high as six.  R. 326.  He ranked his left knee pain as

---

[8]     Chondral refers to cartilage, and the patella refers to the kneecap.  STEDMAN'S at 330,
1310.

[9]     Patellofemoral pain syndrome refers to pain under and around the kneecap.  "The exact
cause of patellofemoral pain isn't known. It probably has to do with the way your kneecap (patella) moves
on the groove of your thigh bone (femur)."  American Academy of Family Physicians, *Patellofemoral Pain
Syndrome*, http://familydoctor.org/479.xml (last visited Sept. 20, 2006).

six, with the pain sometimes as high as ten.  R. 326.  Dr. Estampador-Tan observed that Sullivan walked with a mild limp without need for an assistive device.  R. 326.

Upon examination, Dr. Estampador-Tan observed tenderness in the right AC joint and left patella.  She observed no swelling in the left knee joint.  ROM in both upper and lower extremities was normal with pain at the end of the range for the right shoulder.  Strength was 5/5 except for the right shoulder, which was 4+/5 accompanied by pain.  Sullivan experienced knee pain on testing.  R. 327.

Dr. Estampador-Tan concluded as follows: Sullivan could occasionally lift less than one hundred pounds; he could stand or walk less than two hours in an eight-hour work day due to uncontrolled pain; he had no limitations on sitting during an eight-hour workday; he was limited in his ability to push or pull in both upper and lower extremities; he could never climb, balance, or crouch, and could occasionally kneel, crawl, and stoop; his reaching was limited to occasionally; his gross manipulation was limited; he was limited against temperature extremes, vibration, humidity/wetness, hazards including machines and heights, and fumes.  R. 327-28.

In May 2003, Sullivan told Samuel S. Blick, M.D., that he had occasional numbness with pain at a level of three to four on a ten scale.  R. 183.  Upon examination, Dr. Blick observed some mild shoulder pain with impingement testing and tenderness on palpation, but his grip strength was not diminished.  R. 184.  He administered an injection for pain, and placed Sullivan on work restrictions.  R. 183-85.  The separate work

restriction form does not appear to be in the record.  R. 185 ("(please see separate work status form)").

In June 2003, Sullivan was seen by Jose A. Torres, M.D., for right shoulder pain. R. 343.  In September 2003, an MRI of the shoulder revealed hypertrophic changes of the AC joint with no rotator cuff tear, and a small joint effusion.[10]  R. 342.

In February 2004, Sullivan was seen by Dr. Torres for examination of his shoulder and knees.  Dr. Torres observed no changes in Sullivan's shoulder, and noted that Sullivan continued to have pain and limited range of motion.  With respect to the knee, Sullivan reported that he had intermittent popping and catching of the knee with a sensation of giving out.  On examination, Dr. Torres observed severe crepitus[11] and a small knee effusion.  Dr. Torres wrote that the knee was stable but he was concerned that Sullivan might have a torn medial meniscus.[12]  R. 341.

---

[10]     "The escape of fluid from the blood vessels or lymphatics into the tissues or a cavity." STEDMAN'S at 546.

[11]     Crepitus refers to "[n]oise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions."  STEDMAN'S at 424.

[12]     "A crescent shaped fibrocartilaginous structure of the knee . . . ."  STEDMAN'S at 1089.

In March 2004, Sullivan was seen at the Florida Hospital Kissimmee for magnetic resonance imaging of the left knee at Dr. Torres's request.   The examination revealed a tear to the medial meniscus. There were degenerative changes and evidence of subchondral sclerosis[13] and edema.[14]  R. 340.

C.      Reviewing Professionals.

In September 2001, a physician whose signature is illegible completed a Residual Functional Capacity Assessment based on a review of Sullivan's records.  R. 344-51. The reviewer concluded that Sullivan could occasionally lift up to twenty pounds, frequently lift up to ten pounds, stand and walk for at least two hours in an eight-hour workday, and sit for six hours in an eight-hour workday.  R. 345.  The reviewer noted a decreased ROM in both the left knee and right shoulder, and an antalgic gait.  *Id.* The reviewer concluded that Sullivan would have occasional limitations on stooping, kneeling, and crouching.  R. 346.

In January 2002, Violet A. Stone, M.D., completed a Physical Residual Functional Capacity Assessment.  R. 352-59.  Dr. Stone concluded that Sullivan could occasionally lift up to twenty pounds, frequently lift up to ten pounds, stand, walk, and sit for six hours in an eight-hour workday, and was limited in his ability to push and pull in the upper extremities.  R. 353.  She noted that Sullivan had decreased ROM in both his knee and

---

[13]      Also known as eburnation, subchondral sclerosis refers to "[a] change in exposed subchondral bone in degenerative joint disease in which it is converted into a dense substance with a smooth surface like ivory."  STEDMAN'S at 538.

[14]      Edema is "[a]n accumulation of an excessive amount of watery fluid in cells, tissues, or serous cavities."  STEDMAN'S at 544.

shoulder, but that there was no evidence of swelling, heat, redness, tenderness, or inflammation. R. 354. Similarly, there was no evidence of knee instability. *Id.* Sullivan had an antalgic gait. *Id.* She concluded that Sullivan would be occasionally limited from climbing ladders, ropes and scaffolds and reaching overhead. R. 354-56.

In January 2003, David Z. Kitay, M.D., competed a Physical Residual Functional Capacity Assessment. R. 360-67. His conclusions on Sullivan's ability to lift, stand, walk, and sit were the same as Dr. Stone's. R. 361. Dr. Kitay opined that Sullivan would be occasionally limited from climbing ladders, ropes and scaffolds, kneeling, and crouching, but had no other limitations. R. 362-64.

In April 2003, Dr. Stone completed another Physical Residual Functional Capacity Assessment. R. 383-90. Dr. Stone concluded that Sullivan could occasionally lift up to twenty pounds, frequently lift up to ten pounds, stand, walk, and sit for about six hours in an eight-hour workday, and had no limitations on ability to push and pull. R. 384. She concluded that he would have occasional limitations on his ability to kneel and crawl because of knee pain. R. 385. He was limited in reaching all directions, including overhead, because of his right shoulder. R. 386. She opined that the consulting physician's recommendation that Sullivan could not walk or stand for more than two hours was inconsistent with examinations showing no limitations in his knee and his ability to walk without an assistive device. R. 389.

## IV.    STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment severe?

(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

(5) Is the claimant unable to perform any other work within the

      economy?

20 C.F.R. § 404.1520(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g., McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987) (per curiam).

      "The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

      A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

      The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

## V.     ANALYSIS.

Sullivan asserts two grounds supporting reversal. First, that the ALJ should have called a vocational expert (VE) to provide evidence at step five of the sequential evaluation process. Second, that the ALJ improperly evaluated his subjective complaints of pain. These are the only issues I will address.[15]

---

[15]     The Scheduling Order in this case provides that "[a]ny issue not specifically raised by the plaintiff will be considered to have been waived unless the interests of justice require the Court to consider the issue." Doc. No. 5 at 2.

A.      *Need for a VE at Step Five of the Evaluation Process.*

Sullivan contends that when, as here, an ALJ finds that the claimant has

nonexertional impairments that limit the ability to work at a given exertional level, the ALJ

must call upon a VE to assess whether there is work that the claimant can perform that is

available in the national economy.  The Commissioner contends that use of a VE is not

necessary when, as here, the ALJ relied upon Social Security Rulings to determine that

the nonexertional limitations did not significantly limit the claimant's basic work activities.

Before the Grids were promulgated in 1979, the preferred method of determining

whether there was work available that a social security claimant could perform was

through the testimony of a VE.  *See Cowart v. Schweiker*, 662 F.2d 731, 736 (11th Cir.

1981).  After the United States Supreme Court approved use of the Grids in appropriate

cases, *see Heckler v. Campbell*, 465 U.S. 458 (1983), three-judge panels in the Eleventh

Circuit began to address whether the Grids could be relied upon at step five of the

sequential evaluation process when the claimant had nonexertional impairments that

limited his work skills.

The law that developed in this circuit requires that the ALJ initially determine

whether the claimant's alleged nonexertional impairments limit the ability to work; if they

do not, then exclusive reliance on the Grids at step five of the evaluation process is

appropriate. *See Reeves v. Heckler*, 734 F.2d 519 (11th Cir. 1984)(citing *Kirk v. Sec'y of

Health & Human Servs.*, 667 F.2d 524, 537 (6th Cir. 1981); *see also Broz v. Schweiker*,

677 F.2d 1351, 1363 (11th Cir. 1982)(remanding for consideration whether a claimant's

nonexertional impairments significantly limited his basic work skills, and then, whether

the Grids could be used), *vacated, Heckler v. Broz*, 461 U.S. 952 (1983), *adhered to on remand, Broz v. Schweiker*, 711 F.2d 957 (11th Cir.), *modified in other respects*, 721 F.2d 1292 (11th Cir. 1983).  However, if the ALJ finds that the claimant's nonexertional impairments significantly limit the claimant's basic work skills, otherwise stated as precluding the wide range of work at a given exertional level, then exclusive reliance on the Grids is not permitted.  *See Phillips v. Barnhart*, 357 F.3d 1232, 1242 (11th Cir. 2004) (citing Francis *v. Heckler*, 749 F.2d 1562, 1567 (11th Cir. 1985)). Rather, the ALJ must turn to VE testimony regarding the specific jobs that the claimant can perform in light of the claimant's functional capacity.  *See id.* at 1243; *Welch v. Bowen*, 854 F.2d 436, 439-40 (11th Cir. 1988); *Gibson v. Heckler*, 762 F.2d 1516, 1521-22 (11th Cir. 1985).

The ALJ's decision that nonexertional impairments do not significantly limit basic work skills (that is, do not preclude a wide range work at a given exertional level) must be supported by substantial evidence in the record. For example, in *Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989), the ALJ found that the claimant had nonexertional impairments arising from borderline intellectual functioning and a dysthymic disorder that precluded her from performing complex tasks and working under extraordinary stress. The ALJ concluded that these nonexertional limitations only slightly diminished the claimant's capacity to perform light work and relied upon the Grids to conclude that there was work available the claimant could perform.  The Eleventh Circuit reversed the decision, holding that use of the Grids was inappropriate.  The Court explained as follows: "Absent testimony from a vocational expert, the ALJ's conclusion that appellant's mental limitations do not significantly compromise her basic work skills or are not severe

enough to preclude her from performing a wide range of light work is not supported by substantial evidence." *Id.* at 1202.

Similarly, in *Marbury v. Sullivan*, 957 F.2d 837 (11th Cir. 1992), the ALJ found that the claimant had a seizure disorder that resulted in a nonexertional impairment limiting his ability to work around unprotected heights or hazardous machinery.  The ALJ concluded that these nonexertional limitations did not reduce the range of light work available to the claimant.  The court reversed this decision, emphasizing that "'it is only when the claimant can clearly do unlimited types of light work, . . . that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy." *Id.* at 839 (quoting *Allen v. Sullivan,* 880 F.2d 1200, 1202 (11th Cir. 1989), and *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. Unit A March 1981)).

In the present case, the ALJ found that Sullivan's shoulder impairment would limit his ability to reach overhead and that his knee impairment would limit him to only occasional kneeling and crawling.  The ALJ relied upon Social Security Rulings 83-14 and 85-15 to conclude that these nonexertional limitations did not significantly limit Sullivan's ability to perform light work.  I have not found any Eleventh Circuit decision in which the court approved reliance on a Social Security Ruling, without other evidence, to support such a finding.  Under the law discussed above, the rule in this circuit appears to be that when the ALJ finds that nonexertional impairments exist, VE testimony is necessary to support an ALJ's conclusion that those nonexertional impairments do not significantly limit basic work skills.  *See, e.g.*, *Marbury*, 957 F.2d at 839.

Accordingly, remand is required to permit the Commissioner to obtain vocational expert testimony to determine whether Sullivan's nonexertional limitations significantly limit his ability to perform work at the appropriate level of exertion.[16] If they do, then reliance on the Grids is improper.

B.    Credibility.

Sullivan contends that the ALJ also erred in his conclusion that Sullivan's complaints of pain and other subjective symptoms were not fully credible.

There is no dispute that Sullivan has underlying medical conditions that could give rise to the complaints of pain and limitations in movement of his shoulder and knee about which he complained. Therefore, to support the conclusion that these complaints were not fully credible, the ALJ was required to "articulate explicit and adequate reasons for doing so." *Foote v. Chater*, 67 F.3d 1553, 561-62 (11th Cir. 1995).

In support of his findings that Sullivan's "allegations and subjective symptoms [are] beyond what could be expected considering the objective laboratory and clinical findings," R. 16, the ALJ observed that Sullivan "lived a fully functional type lifestyle, which is consistent with the medical evidence. [He] is able to take care of his personal needs.  He is able to drive and do yard work.  He has not been treated for his shoulder or knee for a few years.  In fact he testified he could lift up to 50 pounds occasionally." *Id.*

---

[16]    As part of his argument on the need for a vocational expert, Sullivan contends that the ALJ did not properly consider the opinions of his treating and consulting physicians in determining his RFC. Because this case will be remanded for further proceedings, the Commissioner should consider the opinions of the treating, consulting, and reviewing professionals in the manner required by the law of this circuit in reevaluating Sullivan's RFC.

The ALJ's observation that Sullivan could care for his personal needs is inconsistent with the statements from Sullivan and his family that Sullivan had trouble dressing himself, could not raise his arm to wash his hair or shave, had difficulty stepping out of a shower, had trouble completing household chores, and could only drive for limited periods due to pain in his knee.  The assertion that Sullivan testified that he could lift up to fifty pounds is taken out of context.  Sullivan said that he had been restricted to lifting fifty pounds from the ground to waist-level, and that he could perform this lifting occasionally.

More importantly, the ALJ's observation that Sullivan had not been treated for his shoulder or knee impairment for a few years is incorrect.  In May 2003 and February 2004, Sullivan was seen for continuing pain in his right shoulder.  Sullivan was also treated by Dr. Torres in February 2004, for continuing problems with his left knee.  An MRI revealed a torn medial meniscus.  R. 340-41.

Accordingly, I conclude that the ALJ's finding that Sullivan's subjective complaints were not totally credible is not supported by substantial evidence.

C.      *Award of Benefits or Remand.*

Sullivan requests that the Court order the Commissioner to pay him disability benefits.  A court may order an award of benefits "where the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt."  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997).  Here, the record does not establish disability without any doubt.  Rather, remand is required to

permit the Commissioner to reevaluate Sullivan's complaints of pain and other subjective symptoms.

## VI.    CONCLUSION.

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** under sentence four of 42 U.S.C. § 405(g) for further proceedings.  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on September 20, 2006.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties